## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MARY BRADY, Personal Representative of
the Estate of DONALD MURRAY,

      Plaintiff,                          Case No. 12-12365

v.                                        Hon. Gerald E. Rosen

CITY OF WESTLAND, POLICE OFFICER
DAWLEY, SERGEANT BIRD, LIEUTENANT
BENSON, OFFICER MYTYCH, and OFFICER
LORENZETTI,

      Defendants.

_____/

## OPINION AND ORDER GRANTING
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____February 18, 2014_____

PRESENT:  Honorable Gerald E. Rosen
                Chief Judge, United States District Court

## I.  INTRODUCTION

On May 31, 2012, Plaintiff Mary Brady commenced this action in this Court on

behalf of the estate of her late son, Donald Murray, asserting federal claims under 42

U.S.C. § 1983 and various state-law claims against the City of Westland, four Westland

police officers, and a Garden City police officer arising from the Defendant officers'

alleged use of excessive force against Mr. Murray during a July 30, 2011 incident in a

Westland neighborhood.  More specifically, the Defendant officers were summoned to the scene after Mr. Murray, evidently under the influence of crack cocaine, was seen wandering through the neighborhood acting strangely and yelling "call the cops," and after he forcibly entered a home and began to assault its 80-year-old occupant, Beverly Moore.  Ms. Moore's son, Darryl Moore, was able to wrestle Mr. Murray out to the front porch of the home, where two neighbors came to Mr. Moore's aid in his struggle with Mr. Murray.  Upon arriving at the home, the Defendant officers took over from Mr. Moore and his neighbors in the effort to restrain Mr. Murray, and the officers eventually were able to overcome Mr. Murray's continued resistance and handcuff him with the assistance of a single Taser stun administered to Mr. Murray's lower back.  Shortly after this struggle, Mr. Murray began having difficulty breathing and a Westland officer administered CPR, but Mr. Murray was pronounced dead upon his arrival at a nearby hospital.

Through the present motions, the Defendant law enforcement officers and the City of Westland seek an award of summary judgment in their favor on each of the claims asserted against them in Plaintiff's complaint.[1]  In support of their motions, Defendants argue primarily (i) that the force used by Garden City police officer Randy Lorenzetti and Westland officers Stephen Bird, Bryan Mytych, and Christopher Benson to subdue and

---

[1]Two such motions are pending before the Court, one brought by Defendant Garden City police officer Randy Lorenzetti, and the other brought by the Defendant City of Westland and the four Westland police officers named in Plaintiff's complaint (collectively referred to hereafter as the "Westland Defendants").

handcuff Mr. Murray was appropriate under the circumstances; (ii) that there is no evidence that the other Westland officer named as a Defendant in the complaint, Kyle Dawley, was involved in the efforts to restrain Mr. Murray or otherwise inflicted any force whatsoever on Mr. Murray during the course of the encounter giving rise to this suit; and (iii) that Plaintiff has failed to identify a policy or custom of the Defendant City of Westland that was the moving force behind any alleged violation of Mr. Murray's federal constitutional rights.  In response, Plaintiff relies exclusively on the police reports prepared by the Defendant officers and photographs of Mr. Murray reflecting injuries he evidently sustained during the incident in question to argue that issues of fact remain as to whether one or more of the Defendant officers might have inflicted force on Mr. Murray after he was subdued and no longer posed a threat to the officers or anyone else on the scene.[2]

Defendants' motions have been fully briefed by the parties.  Having reviewed the parties' briefs and their accompanying exhibits, as well as the remainder of the record, the Court finds that the relevant allegations, facts, and legal issues are sufficiently presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendants' motions "on the briefs."  *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order sets

---

[2]As to Defendant Westland officer Kyle Dawley, Plaintiff concedes in her response to the Westland Defendants' motion that Officer Dawley was not present during the encounter between Mr. Murray and the other Defendant police officers, and that he therefore is entitled to an award of summary judgment in his favor.

forth the Court's rulings on these motions.

## II.  <u>FACTUAL BACKGROUND</u>

The Westland Defendants suggest in their motion that Plaintiff has "completed no discovery" and has essentially "abandoned any sincere effort to develop this case." (Westland Defendants' Motion, Br. in Support at 5-6.)  Although Plaintiff disputes this, asserting that she has "diligently undertaken discovery," (Plaintiff's Response Br. at 11), the fact remains that the only exhibits accompanying Plaintiff's responses to Defendants' motions are (i) a report prepared by the Westland police following the incident giving rise to this suit, and (ii) copies of photographs taken of Donald Murray after this incident.  So far as the record discloses, none of the Defendant police officers has been deposed, and the only deposition testimony in the record is that of Plaintiff Mary Brady, who has conceded that she lacks any direct knowledge of the events giving rise to the claims in this case.  (*See* Westland Defendants' Motion, Ex. 11, Plaintiff's Dep. at 109.) Accordingly, the following account of the facts is derived almost exclusively from the reports of the Defendant police officers,[3] as well as the statements and affidavits of a few

_____

[3]The Court acknowledges that its reliance on the narrative reports of the Defendant police officers could be viewed as problematic, as the statements in this report are hearsay and may not be considered in resolving a summary judgment motion, *see Alexander v. CareSource,* 576 F.3d 551, 558 (6th Cir. 2009), absent some applicable hearsay exception.  Arguably, the police reports may lie within the hearsay exception for public records, *see* Fed. R. Evid. 803(8)(A)(iii), at least to the extent that the reports consist of the Defendant officers' accounts of their firsthand observations.  *See Dortch v. Fowler,* 588 F.3d 396, 402-04 (6th Cir. 2009); *Miller v. Field,* 35 F.3d 1088, 1091 (6th Cir. 1994).  Any such reliance on the public records exception becomes more questionable, however, to the extent that the police reports incorporate the statements of non-party witnesses at the scene of the officers' encounter with Mr. Murray.  *See Miller,* 35 F.3d at 1091.  Defendants could have alleviated these hearsay concerns by submitting affidavits from

4

non-party witnesses that are included as exhibits to Defendants' motions.

On Friday, July 29, 2011, Donald Murray and a friend visited the Westland apartment of Mark and Annette Robinson, where they ate dinner, played cards, drank beer, and remained overnight.  According to Mark Robinson's statement to the Westland police, Mr. Murray behaved normally on Friday, but began to act strangely on Saturday morning.  (*See* Westland Defendants' Motion, Ex. 3, Westland Police Report at 19.) Mark Robinson further stated that from past experience, Mr. Murray would act this way when he was high on crack cocaine.  (*See id.*)[4]  Likewise, Annette Robinson characterized Mr. Murray as acting "[s]cared" and "[p]aranoid," and she too viewed this behavior as attributable to Mr. Murray smoking crack.  (*See* Westland Defendants' Motion, Ex. 2,

---

the Defendant officers in support of their summary judgment motions, but they did not do so.

Nonetheless, the Court finds that it may permissibly look to the police reports in resolving Defendants' motions, in light of Plaintiff's failure to raise any evidentiary objections to the Court's consideration of these materials.  The Sixth Circuit has held that "[i]f a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to be waived." *Wiley v. United States,* 20 F.3d 222, 226 (6th Cir. 1994).  Indeed, Plaintiff not only failed to raise any hearsay concerns or other evidentiary objections with respect to the police reports, but she explicitly relied on the reports of the Westland officers as the basis for her counter-statement of facts in her responses to Defendants' motions.  Accordingly, Plaintiff is in no position to complain about the Court's consideration of the police reports, where she herself has relied on these reports in her submissions to the Court, and where she had ample opportunity during the discovery period to depose the Defendant officers and challenge the veracity of the accounts in their reports.

[4]Although Mr. Robinson did not actually witness Mr. Murray smoking crack that Saturday morning, he opined that it was possible that Mr. Murray had stepped outside the apartment to do so.  (*See id.* at 20.)

Statement of Annette Robinson.)[5]

At around 10:00 a.m. on Saturday morning, July 30, 2011, Mr. Murray exited the Robinsons' apartment, taking an ashtray on his way out, and walked to a nearby Westland neighborhood. As Mr. Murray traveled through this neighborhood, he attracted the attention of the residents by yelling and acting as though he was drugged or intoxicated. (*See* Westland Police Report at 10; *see also* Westland Defendants' Motion, Ex. 6, Cudney Aff. at ¶ 3.) Mr. Murray threw the ashtray he was carrying against the side of a house, shattering it, and then climbed a fence and headed toward the home of 80-year-old Beverly Moore and her son, Darryl Moore. (*See* Westland Police Report at 10; *see also* Westland Defendants' Motion, Ex. 4, Darryl Moore Aff. at ¶ 2.)

Upon reaching the Moore residence, Mr. Murray began pounding on the front door. (Westland Police Report at 18.) When Ms. Moore opened the door, Mr. Murray pushed past her and entered the home. Darryl Moore was in the basement at the time, and came upstairs to check on his mother after he heard "screaming and a loud noise or thud from the upstairs." (Darryl Moore Aff. at ¶ 3.) Mr. Moore discovered "an unknown person walking from my kitchen toward my mother in the living room area," and he unsuccessfully attempted to steer this individual out the back door. (*Id.* at ¶¶ 4-5.) Mr. Murray then entered the living room, where he "kicked over a table, grabbed a vase or

---

[5]The Westland police later spoke to Mr. Murray's mother, Plaintiff Mary Brady, and she likewise stated that Mr. Murray acted paranoid and sometimes violent when he smoked crack. (*See* Westland Police Report at 16.)

mug and raised his arm as if to threaten" Ms. Moore.  (*Id.* at ¶ 6.)  As Mr. Murray grabbed Ms. Moore's arms, pinned them behind her, and "began to pull her through the house," Mr. Moore grabbed and struggled with Mr. Murray in an effort to force him through the front door.  (*Id.* at ¶¶ 7-8.)  Although Mr. Murray "resisted with great force," pushing Ms. Moore to the floor, ripping Mr. Moore's shirt, and breaking his glasses, Mr. Moore eventually was able to forcibly eject Mr. Murray through the front door of his home, where Mr. Murray "fell and struck his head on a column or landscaping bricks" and remained on the ground for several minutes.  (*Id.* at ¶¶ 9-10.)  Mr. Moore then reentered his home to call 911 and tend to his mother.

As Mr. Moore waited for the authorities to arrive, he observed Mr. Murray get up and attempt to scale a fence to leave the Moores' yard.  Mr. Moore grabbed Mr. Murray and told him he could not leave until the police arrived.  (*Id.* at ¶¶ 12-13.)  Mr. Murray then began to struggle with Mr. Moore and move toward the front door of the Moore residence, and Mr. Moore "had to fight with him to prevent him from reentering [his] house."  (*Id.* at ¶ 14.)  As Mr. Moore struggled with Mr. Murray in front of his home, two of Mr. Moore's neighbors, Patrick Cudney and Charles Ables, ran up to assist Mr. Moore in attempting to restrain Mr. Murray, and the three men together were able to push Mr. Murray to the ground.  (*Id.* at ¶ 15; *see also* Westland Defendants' Motion, Ex. 5, Ables Aff. at ¶¶ 3, 5; Ex. 6, Cudney Aff. at ¶¶ 4, 6.)

At this point, Defendant Garden City police officer Randy Lorenzetti arrived at the scene and was advised by a bystander that Mr. Murray had broken into Mr. Moore's

home.  (*See* Defendant Lorenzetti's Motion, Ex. K, Lorenzetti Police Report at 1.)  When

Mr. Murray failed to comply with Officer Lorenzetti's commands to remain on the

ground and put his hands behind his back, the officer began to assist Mr. Moore and his

two neighbors in restraining Mr. Murray by placing his knee on Mr. Murray's back and

attempting to grab ahold of one of Mr. Murray's arms.  (*Id.*)[6]  Despite the efforts of

Officer Lorenzetti and the three other men, Mr. Murray continued to struggle and attempt

to get up off the ground, and he also raised up his head, turned it toward Officer

Lorenzetti, and opened his mouth as though he were trying to bite the officer.  (*Id.*)

Officer Lorenzetti attempted to place Mr. Murray in handcuffs and repeatedly advised

him to stay on the ground, stop resisting, and calm down, but Mr. Murray "continued to

yell and struggle wildly."  (*Id.*)

As this struggle continued for a few minutes, three Westland police officers —

Defendants Stephen Bird, Bryan Mytych, and Christopher Benson — arrived at the

Moore residence and joined the task of attempting to restrain Mr. Murray.  Officer

Lorenzetti informed the Westland officers that he had been unable to secure Mr. Murray's

hands behind his back, and so had handcuffed him with his arms in front of his body.

(*See* Westland Police Report at 9.)  The Westland officers advised Mr. Moore and his

neighbors to step aside so that the officers could take their place, and Sergeant Bird then

---

[6]Mr. Moore and his two neighbors have uniformly stated that they observed blood,
scrapes, bumps, and abrasions on Mr. Murray before Officer Lorenzetti arrived and began to
assist them in restraining Mr. Murray.  (*See* Moore Aff. at ¶ 16; Ables Aff. at ¶ 6; Cudney Aff. at
¶ 7.)

8

grabbed Mr. Murray's leg and dragged him to the center of Mr. Moore's porch in order to get the officers in a "better position to deal with the subject and his resistant behavior." (*Id.* at 12-13.) As Sergeant Bird knelt on the back of Mr. Murray's legs "to prevent him from kicking [the] officers," Lieutenant Benson assisted Officer Lorenzetti with removing his handcuffs from Mr. Murray while Officer Mytych attempted to secure Mr. Murray in another pair of handcuffs with his hands behind his back. (*Id.* at 13.) Throughout this effort, Mr. Murray continued to pull away from the officers, tried to kick at the officers with his legs, and resisted the officers' attempts to get his arms behind his back, and he yelled out unintelligible or nonsense phrases such as "I know Joe Bobby." (*See id.* at 9, 13.)

As the officers continued to struggle with Mr. Murray, Sergeant Bird directed him to stop resisting and to place his arms behind his back. (*See id.* at 13.) When Mr. Murray failed to comply with this command, Sergeant Bird "punched the subject once on his right side with a closed fist in order to attempt to cause him to stop tensing his muscles preventing his arm from going behind him." (*Id.*) Mr. Murray still refused to comply, however, and Sergeant Bird warned him that "if he did not stop resisting . . . he was going to be tased." (*Id.*) As Mr. Murray continued to resist the officers' efforts to secure his hands behind his back, Sergeant Bird deployed his taser, applying a three-second drive stun to Mr. Murray's lower back. (*Id.*)[7] Although this use of a taser apparently had only

---

[7]The three Westland officers uniformly stated in their police reports that Sergeant Bird warned Mr. Murray before deploying his taser. (*See id.* at 9, 11, 13.) Similarly, Mr. Moore and

a "minimal [e]ffect" on Mr. Murray, and although he continued to struggle, the officers eventually were able to position Mr. Murray's arms behind his back and place him in handcuffs.  (Westland Police Report at 13.)

Once he was handcuffed, Mr. Murray ceased his active struggles with the Defendant police officers, and instead began to passively resist the officers' efforts to escort him to their patrol car by making his legs go limp.  (*See id.* at 9, 13.)  Thus, Officers Mytych and Lorenzetti were forced to pick Mr. Murray up and carry him to Officer Mytych's police car, where Mr. Murray was placed on the ground and searched by another Westland officer incident to his arrest.  (*See id.* at 9.)

During this search, Mr. Murray was observed breathing heavily, so the officers sat him upright against Officer Mytych's vehicle and Lieutenant Benson requested that emergency medical personnel report to the scene.  (*See id.* at 9, 11-12.)  Before this emergency medical assistance could arrive, however, Mr. Murray stopped breathing and the officers could not detect a pulse.  (*See id.* at 13.)  The officers removed Mr. Murray's handcuffs, laid him flat on the ground, and began to administer CPR.  (*See id.* at 13-14.)  Emergency medical personnel took over this task upon their arrival, and then transported Mr. Murray to Garden City Hospital, where he was pronounced dead shortly thereafter.  (*See id.* at 14.)  A medical examiner's report cited "excited delirium" as the cause of

---

his neighbors have stated that although they did not observe Mr. Murray being tasered, the Westland officers instructed Mr. Murray several times to stop resisting, but he continued to struggle against the officers' efforts to handcuff his arms behind his back.  (*See* Moore Aff. at ¶¶ 21-22; Ables Aff. at ¶¶ 15, 18; Cudney Aff. at ¶¶ 16, 19.)

death.  (Westland Defendants' Motion, Ex. 14, Medical Examiner's Report at 1.)[8]

## III.  ANALYSIS

### A.  The Standards Governing Defendants' Motions

Through the present motions, the Defendant City of Westland and the five

Defendant law enforcement officers seek an award of summary judgment in their favor on

Plaintiff's federal claims under 42 U.S.C. § 1983 of excessive force and municipal

liability, as well as Plaintiff's state-law claims of assault and battery, gross negligence,

and intentional infliction of emotional distress.  Under the Federal Rule governing these

motions, summary judgment is proper "if the movant shows that there is no genuine issue

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[]

mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden

of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552

(1986).

In deciding a motion brought under Rule 56, the Court must view the evidence "in

---

[8]As explained by the medical examiner, excited delirium is a disorder that is
characterized by "a sudden onset, with symptoms of bizarre and/or aggressive behavior, bizarre
speech, shouting, paranoia, panic, violence toward others, unexpected physical strength, reduced
response to pain and hyperthermia."  (*Id.*)  This disorder "can result in sudden death and is
commonly associated with the presence of cocaine or other stimulants in the blood."  (*Id.*)
Consistent with this finding of the cause of death, a post-mordem examination of Mr. Murray
"revealed cocaine and cocaine breakdown products in Mr. Murray's blood and urine."  (*Id.*)

a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences."  *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir. 2007).  Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Finally, "[a] mere scintilla of evidence is insufficient" to withstand a summary judgment motion; rather, "there must be evidence on which the jury could reasonably find for the non-moving party."  *Smith Wholesale,* 477 F.3d at 861 (internal quotation marks and citation omitted).

**B.  The Defendant Police Officers Are Entitled to Qualified Immunity from Liability for Plaintiff's Federal § 1983 Claim of Excessive Force.**

In Count I of her complaint, Plaintiff seeks to hold the five individual Defendant police officers liable under 42 U.S.C. § 1983 for their alleged infliction of excessive force upon her son, Donald Murray, during the July 30, 2011 encounter that culminated in Mr. Murray's death.  Through the present motions, the Defendant officers seek a determination as a matter of law that they did not use excessive force in their efforts to subdue Mr. Murray, and they contend, in the alternative, that the doctrine of qualified

immunity shields them from liability for any excessive force they arguably might have employed.  The Court finds it unnecessary to resolve the first of these questions, as it readily concludes that the Defendant officers are entitled to qualified immunity.

In this case, Plaintiff's federal § 1983 claims against the Defendant police officers rest exclusively on the Fourth Amendment right to be free from the use of excessive force.  *See Graham v. Connor,* 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989).  As the Sixth Circuit has explained:

> The Fourth Amendment requires that an officer's use of force be objectively reasonable, and courts must balance the consequences to the individual against the government's interest in effecting the seizure.  This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case.  Courts evaluating the reasonableness of force used should pay particular attention to the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Burchett v. Kiefer,* 310 F.3d 937, 944 (6th Cir. 2002) (internal quotation marks and citations omitted).

Defendants' appeal to the doctrine of qualified immunity adds an extra layer of analysis to this excessive force inquiry.  Under this doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).  Application of the doctrine entails two inquiries.

13

"First, the court must determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiff[] show that a constitutional violation has occurred." *Burchett,* 310 F.3d at 942. "If the court finds a constitutional violation, it must then consider whether the violation involves clearly established constitutional rights of which a reasonable person would have known." *Burchett,* 310 F.3d at 942. The two steps of this test for qualified immunity need not be rigidly considered in the same sequence in every case; rather, the Supreme Court recently held that judges "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan,* 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009).

The Court's qualified immunity inquiry here is largely controlled by the Sixth Circuit's recent decision in *Hagans v. Franklin County Sheriff's Office,* 695 F.3d 505 (6th Cir. 2012). In that case, the plaintiff's decedent, Patrick Hagans, exhibited paranoia and aggressive behavior after smoking crack cocaine, first locking himself in his bathroom and then breaking and climbing through the bathroom window, "running around his yard screaming," and "kicking chairs around his deck and jumping on top of cars in his driveway." *Hagans,* 695 F.3d at 507. His neighbor was woken by this commotion and called the police. When the first officer arrived, "a shirtless Hagans came running toward him," refusing the officer's order to stop and "bolt[ing] for the backyard." 695 F.3d at 507. As Hagans continued to evade the officer and ran back to the front of his house, he

14

encountered a second police officer and "began yanking on the locked driver's side door handle" of this officer's squad car. 695 F.3d at 507. The two officers wrestled Hagans to the pavement and tried to subdue him but he "refused to be handcuffed," instead "lock[ing] his arms tightly under his body, kicking his feet and continuing to scream." 695 F.3d at 507.

A third officer, Jason Ratcliff, then arrived on the scene and joined in his fellow officers' struggle with Hagans:

> Seeing that Hagans was still actively resisting, Ratcliff unholstered his taser and applied it in drive-stun mode, pressing the taser directly against Hagans' upper back. The shock apparently did not faze Hagans, as he reached back and tried to grab the taser. Ratcliff tased Hagans a second time, again to no effect and again prompting Hagans to grab for the device. At this point, Ratcliff tried to use the taser in dart mode, firing two electric probes at Hagans from a distance, but the probes missed (how, from such a short distance, is not clear). Ratcliff tased Hagans two to four more times in drive-stun mode. Realizing that the shocks were not working, Ratcliff joined the other two officers in trying to subdue Hagans by hand. After struggling for twenty or thirty seconds, the three officers finally secured Hagans' wrists with handcuffs and put shackles on his legs to keep him from kicking or running.

695 F.3d at 507. Hagans initially was alert when a medical squad arrived, but he lost consciousness and stopped breathing about ten minutes later. Although paramedics managed to restore Hagans' pulse and respiration by administering CPR, he never regained consciousness and died three days later.

Hagans' estate brought a § 1983 claim of excessive force against Officer Ratcliff, but the Sixth Circuit held that the officer was entitled to qualified immunity from liability for this claim. As to the first element of the qualified immunity inquiry — namely,

15

whether Officer Ratcliff violated Hagans' Fourth Amendment rights by attempting to

subdue him with a taser after he actively resisted arrest — the court found that this

question "raises some complications," where "[t]he taser remains a relatively new

technology, and courts and law enforcement agencies still grapple with the risks and

benefits of the device."  695 F.3d at 508, 510.  Thus, the court elected to address the

"easier" of the two prongs of the qualified immunity standard, holding that it was not

clearly established at the time of the incident in question, May of 2007, that "using a taser

repeatedly on a suspect actively resisting arrest and refusing to be handcuffed amounted

to excessive force."  695 F.3d at 509.

In so ruling, the court surveyed the pertinent case law and explained that it

uniformly supported a grant of qualified immunity to Officer Ratcliff:

> Cases from this circuit and others, before and after May 2007, adhere to this line: If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him. Consider cases from this circuit first.  In *Williams v. Sandel,* 433 Fed. Appx. 353 (6th Cir. 2011), officers confronted a suspect who was high on ecstasy, nude and jogging along the interstate at night.  *Id.* at 354.  The suspect refused to be handcuffed, prompting officers to tase him *thirty-seven* times (and to use batons and pepper spray as well) until he stopped resisting.  *Id.* at 362.  We held the officers' use of force was reasonable.  *Id.* at 363.  Or consider *Caie v. W. Bloomfield Twp.,* 485 Fed. Appx. 92, No. 11-1378, 2012 WL 2301648 (6th Cir. June 18, 2012).  After two officers wrestled the suspect to the ground, he refused to move his arms from under his body, prompting a third officer to tase him.  *Id.* at 94, 2012 WL 2301648 at *2. The tasing was reasonable given the suspect's "active[] resist[ance] [to] the officers' attempts to secure his arms behind his back."  *Id.* at 97, 2012 WL 2301648 at *4; *see also Williams v. Ingham,* 373 Fed. Appx. 542, 548 (6th Cir. 2010) (officers acted reasonably by tasing suspect who would not move his hands from under his body).

16

> By contrast, when we have found excessive force, the suspects were compliant or had stopped resisting.  In *Kijowski v. City of Niles,* 372 Fed. Appx. 595 (6th Cir. 2010), officers used excessive force by tasing a wedding guest who was sitting in his truck, not disobeying police commands.  *Id.* at 600-01.  And in *Landis v. Baker,* 297 Fed. Appx. 453 (6th Cir. 2008), officers used excessive force by repeatedly tasing a suspect who was pinned on the ground with his face submerged in muddy water.  *Id.* at 464; *see also Roberts v. Manigold,* 240 Fed. Appx. 675, 676 (6th Cir. 2007) (officers used excessive force by repeatedly tasing suspect even though he was "completely pinned"); *cf. Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 901 (6th Cir. 2004) (officers used excessive force by dousing suspect with pepper spray after he was immobilized with handcuffs and leg shackles and stopped resisting).

*Hagans,* 695 F.3d at 509 (emphasis and alterations in original).  Although the Sixth Circuit acknowledged that at least some factors arguably cut against the reasonableness of Officer Ratcliff's repeated use of a taser on Hagans – *e.g.,* Hagans arguably did not pose an immediate threat to the safety of the officers or others, and there was no evidence that he landed any kicks or punches on the officers or that he made any threats — the court observed that "[t]he fact remains that, prior to May 2007 (and for several years after), no case in any circuit held that officers used excessive force by tasing suspects who were actively resisting arrest, even though many of them, like Hagans, were suspected of innocuous crimes, posed little risk of escape and had not yet physically harmed anybody." 695 F.3d at 510-11.

In light of this ruling in *Hagans,* it is readily apparent that the Defendant police officers in this case are entitled to qualified immunity.  The record here discloses that Sergeant Bird used his taser to apply a single, three-second drive stun to Mr. Murray's lower back, and that this was done only after Mr. Murray (i) engaged in a prolonged

17

struggle with four of the Defendant officers and three private citizens, (ii) continually attempted to pull away from and kick the Defendant officers, and generally resisted their efforts to handcuff his arms behind his back, and (iii) was warned by Sergeant Bird that he would be tased if he did not stop resisting.  As the Sixth Circuit emphasized in *Hagans,* "no case in any circuit [has] held that officers used excessive force by tasing suspects who were actively resisting arrest." *Hagans,* 695 F.3d at 511.  Plainly, if Officer Ratcliff in *Hagans* was protected by qualified immunity for his repeated use of a taser on a suspect who continued to resist the efforts of three officers to subdue and handcuff him, Sergeant Bird here is likewise entitled to qualified immunity for his single deployment of a taser on a suspect who was engaged in a prolonged, active struggle against the attempts of the four Defendant officers to subdue and handcuff him.  *See also Caie,* 485 F. App'x at 96-97 (finding that the defendant officer did not use excessive force through a "single use of [a] taser in drive-stun mode," where the suspect had been taken to the ground but "continued to be uncooperative by actively resisting the officers' attempts to secure his arms behind his back"); *Ziolkowski v. City of Taylor,* No. 12-10395, 2013 WL 3872507, at *8-*10 (E.D. Mich. July 24, 2013) (finding that the defendant officer did not use excessive force by deploying his taser "at least five times" on the plaintiff, where "the evidence demonstrate[d] that the plaintiff was unstable, was yelling at police to kill him, and was resisting officers' attempts to handcuff him").

Similarly, to the extent that Plaintiff challenges the Defendant officers' other uses of force during their struggles with Mr. Murray, the record demonstrates that each such

18

use of force was lawfully applied by the Defendant officers in response to Mr. Murray's continued resistance to the officers' commands and efforts to restrain him.  It appears that the first such use of force occurred when Officer Lorenzetti arrived at the Moore residence and observed Mr. Moore and two neighbors struggling with Mr. Murray.  When Mr. Murray failed to comply with Officer Lorenzetti's commands to remain on the ground and put his hands behind his back, the officer placed his knee on Mr. Murray's back and grabbed one of his arms in an attempt to restrain and handcuff him.  Later, as Mr. Murray's struggles continued despite the arrival of three additional police officers and the combined efforts of four officers to subdue him, Sergeant Bird knelt on the back of Mr. Murray's legs and then punched him once in the side with a closed fist in an effort to prevent Mr. Murray from kicking the officers and to overcome Mr. Murray's resistance to placing his arms behind his back for handcuffing.  None of these uses of force could be deemed gratuitous, such that they would support a Fourth Amendment claim of excessive force.  *See Morrison v. Board of Trustees of Green Township,* 583 F.3d 394, 407 (6th Cir. 2009); *see also Baker v. City of Hamilton,* 471 F.3d 601, 607 (6th Cir. 2006) (citing the Sixth Circuit's repeated holdings that "the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law").  Rather, the case law is clear that the limited types of force employed here, in response to a suspect's continued lack of cooperation and active resistance against a police officer's commands and attempts to neutralize and restrain him, fully comport with the Fourth Amendment standard of objective reasonableness.  *See, e.g., Burchett,* 310 F.3d at 944 (finding that the defendant

19

officers used a reasonable amount of force to restrain a suspect who acknowledged that he "twisted and turned some" while the officers tried to handcuff him); *Bozung v. Rawson,* No. 10-1050, 439 F. App'x 513, 521 (6th Cir. Oct. 7, 2011) (finding that the defendant officer did not use excessive force by placing his knee on the back of a suspect who was being handcuffed but was not yet neutralized); *Goodrich v. Everett,* No. 05-6091, 193 F. App'x 551, 556 (6th Cir. Aug. 24, 2006) (finding that the defendant officers did not use excessive force where the "kneeing and kicking" of which the plaintiff complained "occurred not when [the plaintiff] was neutralized, but while the officers were handcuffing him").

Plaintiff's efforts to avoid this outcome are unconvincing, to say the least. First and foremost, Plaintiff's arguments in support of her claim of excessive force rest upon factual assertions that are utterly unsupported in (and often contradicted by) the record. For example, Plaintiff states — without citation to the existing evidentiary record, and without any attempt to persuade the Court that such evidence could be developed and admitted at trial[9] — that Mr. Murray had "submitted to the Defendants['] authority" before the officers used force on him. (Plaintiff's Response Br. at 14.) As recounted above, however, the record shows that Mr. Murray was actively resisting the Defendant officers at the time of each such use of force. Similarly, while Plaintiff asserts — again,

---

[9]Under Fed. R. Civ. P. 56(d), a party may "show by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to a motion for summary judgment, and the Court may then "allow time to obtain affidavits or declarations or to take discovery," Fed. R. Civ. P. 56(d)(2). Here, however, Plaintiff has neither requested this relief nor made any showing that she might be eligible for such relief.

20

with no evidentiary support whatsoever — that Sergeant Bird "unreasonably discharged his taser device without warning or provocation," (*id.* at 10), the police reports of the three Defendant Westland officers uniformly state that Sergeant Bird warned Mr. Murray before deploying his taser, (*see* Westland Defendants' Motion, Ex. 3, Westland Police Report at 9, 11, 13). Stripped of these unsupported — and, of course, non-cognizable — assertions of "fact," Plaintiff's appeal to the unreasonableness of "force against a neutralized person," (Plaintiff's Response Br. at 14), is wholly inapplicable here.

Plaintiff next suggests that she can raise an issue of fact as to her claim of excessive force solely by virtue of photographs in the record that purportedly reveal that "Mr. Murray sustained severe injuries to his arms, face, head and legs during his altercation with Defendants." (*Id.* at 10.) Yet, as a threshold matter, the poor quality black-and-white photos placed into the record by Plaintiff do not clearly disclose any injuries, and they appear to depict only Mr. Murray's head, and not his arms or legs. In any event, nothing in the record would permit the inference that any injuries shown in the photos were inflicted by a Defendant officer; to the contrary, the affidavits of the private citizens involved in the encounter with Mr. Murray attest that these individuals observed blood, scrapes, bumps, and abrasions on Mr. Murray before the first of the Defendant officers arrived on the scene. (*See* Westland Defendants' Motion, Ex. 4, Moore Aff. at ¶ 16; Ex. 5, Ables Aff. at ¶ 6, Ex. 6, Cudney Aff. at ¶ 7). Moreover, to the extent that Plaintiff contends that evidence of injury alone is sufficient to raise an issue of fact as to a Fourth Amendment claim of excessive force, (*see* Plaintiff's Response Br. at 15), the

21

Sixth Circuit decision cited for this proposition does not so hold.  *See Morrison,* 583 F.3d

at 403 (finding that evidence of "bruising and wrist marks create[s] a genuine issue of

material fact with regard to the ***injury prong***" of an "excessive use of force claim ***based***

***on handcuffing"*** (emphasis added)).

Finally, Plaintiff's treatment of the qualified immunity standard is patently

insufficient to withstand Defendants' motions for summary judgment.  First, she makes

no effort to address, much less distinguish, the controlling Sixth Circuit decision in

*Hagans,* despite the substantial factual similarities between that case and this one.

Neither has Plaintiff even attempted to identify the requisite "on-point, controlling

authority or . . . robust consensus of cases of persuasive authority" that would evidence a

"clearly established constitutional violation."  *Ortega v. U.S. Immigration and Customs*

*Enforcement,* 737 F.3d 435, 439 (6th Cir. 2013) (internal quotation marks and citation

omitted).  As indicated by the Court's earlier discussion of the pertinent authorities,

perhaps this is because the case law uniformly supports the Defendant officers' appeal to

the doctrine of qualified immunity under the facts of this case.  It follows that the

Defendant officers are entitled to summary judgment in their favor on the § 1983 claim of

excessive force asserted in Count I of Plaintiff's complaint.

**C.    Plaintiff Has Failed to Identify a Basis for Holding the Defendant City of**
**       Westland Liable Under 42 U.S.C. § 1983 for Any Alleged Violation of Mr.**
**       Murray's Federal Constitutional Rights.**

Apart from the federal § 1983 claims asserted against the individual Defendant

officers, Plaintiff also has asserted a § 1983 claim against the Defendant City of

22

Westland, alleging that this municipality is subject to liability for the excessive force allegedly inflicted on Mr. Murray by the Defendant officers.  Through their present motion, the Westland Defendants argue that Plaintiff has failed as a matter of law to produce evidence that would support the imposition of liability on the Defendant City under § 1983.  The Court agrees.

As a threshold matter, summary judgment could be granted in the Defendant City's favor based solely on the patent inadequacy of Plaintiff's response to the Westland Defendants' arguments against the imposition of municipal liability in this case. Although the heading for the section of Plaintiff's response brief devoted to this subject promises to identify "sufficient evidence" that the Defendant City's "policy o[r] custom caused the alleged constitutional violation," (Plaintiff's Response Br. at 16), this promise is not kept in the text that follows.  Instead, Plaintiff offers only boilerplate language reciting the various means by which a plaintiff may satisfy the municipal liability standard articulated in *Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S. Ct. 2018 (1978), without in any way indicating which of these theories of liability Plaintiff might be pursuing here, much less pointing to any evidence that might support these theories.  It is not the duty of this Court to search the record on Plaintiff's behalf for evidence that might suffice to raise an issue of fact as to the Defendant City's potential liability under § 1983.  *See* Fed. R. Civ. P. 56(c)(1)(A),(c)(3); *see also Harrison v. Oakland County,* 612 F. Supp.2d 848, 859 (E.D. Mich. 2009).

In any event, the court in *Hagans* readily disposed of a claim of municipal liability

23

on grounds that are fully applicable here.  As the Sixth Circuit explained in that case, to

hold a municipal defendant liable under a "failure to train" theory — although, again,

Plaintiff here has failed to suggest whether she is pursuing this or some other theory of

municipal liability — a plaintiff "must show that [the municipality's] failure to train

officers on the proper use of tasers [or some other form of force] amounts to deliberate

indifference." *Hagans,* 695 F.3d at 511 (internal quotation marks and citation omitted).

Yet, the court reasoned that "a municipal policymaker cannot exhibit fault rising to the

level of *deliberate* indifference to a constitutional right when that right has not yet been

clearly established."  695 F.3d at 511 (emphasis in original) (internal quotation marks and

citation omitted).  This reasoning is fully applicable here, where Plaintiff, like the plaintiff

in *Hagans,* has failed as a matter of law to demonstrate a violation of Mr. Murray's

clearly established right to be free from the use of excessive force.  It follows that the

Defendant City is entitled to summary judgment in its favor on Plaintiff's § 1983 claim of

municipal liability.

**D.    The Court Declines to Exercise Supplemental Jurisdiction over Plaintiff's
        State Law Claims, But Instead Dismisses These Claims Without Prejudice.**

Finally, in Count III of her complaint, Plaintiff asserts a variety of state-law claims

against the Defendant City and the individual Defendant police officers.  The Westland

Defendants' discussion of these claims in their motion consists of a single sentence —

tacked as an afterthought onto the end of the portion of their brief addressing Plaintiff's §

1983 claims against the individual Westland police officers, and unaccompanied by

24

citation to any authority — summarily asserting that under the facts of this case, "the alleged claims of assault and battery[,] intentional infliction of emotional distress and gross negligence are also meritless and must be dismissed." (Westland Defendants' Motion, Br. in Support at 11.) Defendant Lorenzetti, for his part, is only slightly more forthcoming on this subject, relying solely (and rather cryptically) on a single federal district court decision holding, under the facts of that case, that a state-law claim of assault and battery against the defendant police officers was subject to dismissal on the same grounds identified by the court for granting qualified immunity against § 1983 liability. (Defendant Lorenzetti's Motion, Br. in Support at 16-17 (quoting *Hall v. Township of Mount Morris,* 198 F. Supp.2d 906, 920 (E.D. Mich. 2002)).)

Under 28 U.S.C. § 1367(c)(3), a court may decline to exercise supplemental jurisdiction over state-law claims where, as here, the court has determined that the federal claims in the case are subject to dismissal. The Sixth Circuit has stated that "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical, Inc. v. Federal Express Corp.,* 89 F.3d 1244, 1254-55 (6th Cir. 1996). The Court elects to follow this customary practice here and dismiss Plaintiff's state-law claims without prejudice, where Defendants have left the Court largely to its own devices in determining whether summary judgment should be granted in their favor on these claims.

## IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that the Westland Defendants' April 1, 2013 motion for summary judgment (docket #21) is GRANTED IN PART, as to Plaintiff's federal 42 U.S.C. § 1983 claims against the Defendant City of Westland and individual Defendants Dawley, Bird, Benson, and Mytych, and is DENIED WITHOUT PREJUDICE as to the state-law claims asserted against these Defendants, with the Court electing not to retain jurisdiction over these claims.  Likewise, IT IS FURTHER ORDERED that Defendant Lorenzetti's March 29, 2013 motion for summary judgment (docket #19) is GRANTED IN PART, as to Plaintiff's federal 42 U.S.C. § 1983 claims against this Defendant, and is DENIED WITHOUT PREJUDICE as to the state-law claims asserted against this Defendant.


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  February 18, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 18, 2014, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135

26